# In the United States Court of Federal Claims

No. 18-829C
(Filed Under Seal:  September 13, 2018)
(Reissued for Publication:  September 18, 2018)*

```
*************************************
TECHNICAL & MANAGEMENT         *
RESOURCES, INC.,               *
                               *
              Plaintiff,       *       Postaward Bid Protest; RCFC 12(b);
                               *       Motion to Dismiss; RCFC 52.1; Cross-
v.                             *       Motions for Judgment on the
                               *       Administrative Record; Fair and
THE UNITED STATES,             *       Reasonable Pricing
                               *
              Defendant.       *
*************************************
```

Jonathan D. Shaffer, Tysons Corner, VA, for plaintiff.

Meen Geu Oh, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Chief Judge

      In this postaward bid protest, plaintiff Technical & Management Resources, Inc. ("TMR") alleges that the contracting officer ("CO") improperly evaluated its proposal in connection with a solicitation issued by the United States General Services Administration ("GSA") for information technology services.  In its protest, TMR focuses on whether the CO properly concluded that it did not propose fair and reasonable pricing.  The court is now presented with TMR's motion for judgment on the administrative record, TMR's motion to supplement the administrative record, defendant's motion to dismiss, and defendant's cross-motion for judgment on the administrative record.  For the reasons explained below, the court grants defendant's cross-motion for judgment on the administrative record and denies the remaining motions.

---

      * The reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on September 17, 2018.  The redactions are indicated with bracketed ellipses ("[. . .]").

# I. BACKGROUND

## A. Solicitation

On June 20, 2016, the GSA issued solicitation QTA0016GBA000 to procure information technology services for the government. Administrative R. ("AR") 4, 14. Specifically, the GSA sought proposals for the Alliant 2 Small Business Governmentwide Acquisition Contract, a multiple-award, indefinite-delivery, indefinite-quantity contract. Id. at 4. An awardee under the solicitation became eligible to receive task orders performed under the contract. Id. at 262-63. The GSA specified that proposals were due by October 7, 2016. Id. at 258.

### 1. Proposal Format and Contents

The GSA required that offerors submit their proposals in seven volumes—general; responsibility; cost-price; past performance; relevant experience; organizational risk assessment; and systems, certifications, and clearances. Id. at 109. Within the general volume, offerors were required to include, among other items, a completed copy of the Document Verification and Self Scoring Worksheet ("Scoring Worksheet"). Id. In the Scoring Worksheet, offerors were required to claim points for meeting specific criteria in the solicitation, which they needed to substantiate with supporting documentation. See id. at 116.

Of particular import to TMR's protest, the GSA instructed offerors to include a completed "cost/price template" and a basis of estimate ("BOE") in the cost-price volume. Id. at 139-40. The cost/price template was a Microsoft Excel spreadsheet in which offerors "propose[d] ceiling rates" for work that would be performed under the task orders. Id. at 141. Specifically, an offeror was to identify its proposed profit, indirect costs,[1] and direct labor rates for the 248 job types—each identified by a contract line item number ("CLIN")—listed in the spreadsheet.[2] Id. at 141-42 (discussing contents); id. at 207-09 (identifying the number of CLINs). Those entries were used to calculate each CLIN's fully burdened rate for the first year of the contract. Id. at 11. For each CLIN, offerors were encouraged to propose direct labor rates within the range that the GSA—relying on information from the United States Department of Labor—set forth in the solicitation ("DOL range").[3] Id. at 141; see also id. ("If the Offeror's proposed direct labor rate is either lower or higher than the provided range, the Offeror's pricing

---

[1] Indirect costs consist of separate percentages for (1) overhead, (2) fringe benefits, and (3) general and administrative expenses. AR 140.

[2] The 248 CLINs reflect that offerors were asked to propose pricing for thirty-one labor categories, which were each divided into four subcategories based on skill level, for work performed at a government site, and separately propose pricing for the same work performed at the contractor's site. AR 1541; see also id. at 207-09 (cost/price template).

[3] The GSA mapped each position to the United States Department of Labor's Bureau of Labor Statistics ("BLS") Standard Occupational Classification System, and then used salary data from the BLS, as well as other sources, to determine a lower- and upper-bound direct labor rate for each position. AR 1539.

may be deemed to be not fair and reasonable."); id. at 197-203 (setting forth a low-end and high-end direct labor rate for each CLIN).  In addition to the template with the proposed ceiling rates, each offeror needed to provide a BOE containing a "clear and concise explanation of [the offeror's] pricing methodology and [its] labor and burden estimating practice."  Id. at 140.  Specifically, an offeror had to explain how it "computed" and "derived" its proposed profit, indirect costs, and direct labor rates.  Id.

### 2. Evaluation Process

The GSA explained in the solicitation that the awardees would be selected based on which offerors presented the highest technically rated proposals with a fair and reasonable price.  Id. at 146.  In broad terms, the GSA's evaluation process consisted of two steps.  See id. at 146-47.  First, the CO would perform a technical evaluation, which involved identifying the preliminary top eighty proposals based on how many points the offerors claimed in their Scoring Worksheets and substantiated with supporting documentation.  Id.  Second, the CO would review those eighty proposals to determine whether the offerors proposed "fair and reasonable pricing."  Id. at 147.  Specifically, the CO would use "[t]he Offerors' cost/price proposal . . . to determine whether the Maximum Rates proposed for each labor category [were] fair and reasonable."  Id. at 153.  The GSA stated that "[f]or each proposed direct labor rate, the basis of fair and reasonableness [would] be the [DOL ranges]" and described how the CO would evaluate the fairness and reasonableness of the proposed profit and indirect costs.[4]  Id.; see also id. at 197-203 (identifying the DOL range for each position).  The GSA further explained that

> [i]f an Offeror does not meet one or more of these parameters for any labor category, the Offeror is strongly advised to provide clear and convincing rationale to support the proposed direct/indirect and/or profit rate(s).  In the event the rationale is not determined reasonable, the proposal will be deemed to have a maximum rate(s) that is not considered fair and reasonable and the proposal would not be eligible for award, regardless of technical score.

Id. at 153 (emphasis added).  If the CO concluded that the offeror did not provide fair and reasonable pricing, its proposal was removed from competition and replaced by the next highest scoring proposal outside of the top eighty.  Id. at 147.  Cost/price proposals could only be modified through discussions, which the GSA indicated that it did not intend to conduct.  Id. at 153.

This process would continue until the top eighty proposals (or more in the case of a tie for the last position) were identified.  Id.  At that point, the CO would cease evaluations and award contracts to the offerors of those proposals.  Id.  As explained in the Source Selection Decision Memorandum, the GSA adhered to the above process for evaluating proposals and did not hold discussions.  Id. at 466-68.

---

[4] The GSA's considerations when evaluating an offeror's proposed profit and indirect costs are not germane to TMR's protest.

### B. TMR's Proposal

TMR claimed 69,000 points on its Scoring Worksheet, which was accompanied by its BOE and cost/price template. Id. at 1538. In the BOE, TMR first provided a general explanation of its pricing methodology:

> Our methodology for establishing Prime Contractor Labor Rates for the [contract] labor categories is [to] use survey data to estimate Direct Labor Salaries for each labor category and apply TMR's historical Indirect [Costs] (Fringe, Overhead, and General and Administrative)[] to the Direct or Labor Rates and add proposed Profit. We have leveraged our existing schedule rates which have been approved by GSA and other Federal Acquisition Contracting Authorities to verify proposed rates to be reasonable. TMR's pricing is aligned with awarded contracts with [the] GSA, [National Institute of Health], and Department of Homeland Security . . . .

Id. at 1478. TMR then addressed how it determined its direct labor rates. TMR stated that it "derived [those rates] from recognized national and regional compensation information from [. . .] and [. . .] data sources." Id. TMR explained that it specifically relied on (1) [. . .], which provides an index of salary information and is better than traditional surveys at tracking new types of jobs; and (2) [. . .], which "provides consensus salary ranges for more than 6,000 position titles" and "includes reliability statistics to meet a Daubert challenge." Id. at 1478-79. TMR concluded by stating that its "method of establishing salaries ensures employee compensation is fair and proper in accordance with historical and real time information" and that its proposed compensation "is based on solid industry data which ensures we can attain and retain required staff throughout the life of the contract." Id. at 1479.

When evaluating TMR's proposal, the CO concluded that TMR's substantiated points placed it within the preliminary top eighty proposals. See id. at 1538. The CO then proceeded to the next step: determining whether TMR proposed fair and reasonable pricing. Id. at 1539.

As reflected in his price-analysis memorandum, the CO analyzed TMR's proposed pricing by first addressing TMR's direct labor rates. Id. After acknowledging that offerors could submit rates outside the DOL ranges, the CO noted that offerors were informed that such rates would not be considered fair and reasonable if they failed to provide a clear and convincing rationale for the deviations. Id. He then observed that TMR proposed [. . .] rates that were below the low end of the DOL ranges and [. . .] rates that were above high end of the DOL ranges. Id.; see also id. (noting that the low rates were on average [. . .]% too low and the high rates were on average [. . .]% too high); id. at 1618-20 (comparing every TMR direct labor rate to the DOL ranges for that CLIN). The CO proceeded to address whether TMR had provided a clear and convincing rationale for the deviations. Specifically, he explained that

> [t]he [BOE] does not provide any justification as to why [TMR] proposed direct labor rates outside of the range[s] provided in the solicitation. In fact there is no mention of the labor rates falling outside the ranges. For direct labor [TMR] only provide[s] information concerning salary surveys and benchmarks in establishing

>   the direct labor and the offeror's position on the reasonableness of their proposed direct labor rates.  The [BOE] does not provide clear and convincing rationale for these CLIN[s] being significantly below and above the ranges identified in the solicitation as being fair and reasonable.

Id. at 1541.  Thus, he concluded that "[t]he proposed direct labor rates cannot be determined fair and reasonable . . . ."  Id.

Despite concluding that TMR did not propose fair and reasonable direct labor rates, the CO continued with his analysis by evaluating TMR's fully burdened rate for each CLIN.  Id. at 1540.  Specifically, he identified [. . .]rates that were more than two standard deviations below the average rate proposed by all offerors and [. . .] rates that were more than two-standard deviations above the average rate proposed by all offerors.[5]  Id.; see also id. (noting that TMR's too-low rates were, on average, [. . .]% below the average, and TMR's too-high rates were, on average, [. . .]% above the average); id. at 1623-25 (comparing TMR's fully burdened rates to the average rates proposed by all offerors and highlighting when TMR's rates were two or more standard deviations above or below the average).  He then explained

>   [In its BOE, TMR] makes general references to prior contracts and market indices justifying the proposed rates, however, no specific data is provided to support these claims.  [TMR] does not provide adequate justification for pricing that is this low and high in comparison to other pricing offered in response to the solicitation.  Based on this comparison, the proposed pricing is determined to not be fair and reasonable, nor realistic, for the potential work under a[n] A2SB contract.  It would be unconscionable to determine this pricing fair and reasonable because the offeror did not make an attempt to follow the directions for direct labor, proposing outside the ranges in the solicitation without adequate justification.  This demonstrates a severe lack of understanding of the solicitation and potential work to be performed under the A2SB contract.

Id. at 1540-41.

The CO concluded that (1) TMR "did not provide a clear and convincing rationale for [its] direct rates being lower and higher than the [DOL] ranges," and (2) TMR's "fully burdened maximum rates proposed were . . . not comparable to others proposed in response to the solicitation."  Id. at 1542.  Thus, the CO determined that TMR was "not eligible for an award" because its "proposal has ceiling rates that are not fair and

---

[5] The CO presented the average proposed labor rates on a chart.  AR 1623-25.  Although the CO did not explicitly identify on the chart whether the average was derived from the rates proposed by all offerors or just the awardees, see id., the logical reading is that the average reflects the rates from all offerors because the chart was created before awardees were selected, see id. at 1541-42 (relying on information from the chart to evaluate TMR's proposal).  This reading is further supported by the CO's subsequent references to the information in the chart.  See id. (discussing information from the chart to support the conclusion that that TMR's rates were "not comparable to others proposed in response to the solicitation").

-5-

reasonable." Id. This decision was later memorialized in the Source Selection Decision Memorandum, in which the CO noted that TMR was removed due to pricing issues. Id. at 471.

On February 14, 2018, the GSA posted an award notice reflecting that the agency selected eighty-one awardees.[6] Id. at 480-88. TMR was not listed as an awardee. Id. TMR promptly requested a debriefing. Id. at 1739. In a March 9, 2018 debriefing letter, the CO reiterated the explanation he set forth in his price-analysis memorandum. Compare id. at 1539-42 (memorandum), with id. at 1743-45 (debriefing letter). Ten days later, on March 19, 2018, TMR filed a protest with the Government Accountability Office ("GAO"), id. at 1777, which the GAO dismissed because protests concerning the same procurement were pending before this court, id. at 1815.

### C.  Procedural History

After its protest was dismissed at the GAO, TMR filed its protest with the court on June 12, 2018. In its complaint, TMR alleges that the CO did not evaluate its proposed pricing in a reasonable manner or in accordance with the terms of the solicitation. Based on these allegations, TMR requests that the court (1) declare that the GSA violated material terms of the solicitation by not awarding TMR a contract and (2) award permanent injunctive relief directing the GSA to either award TMR a contract or reevaluate TMR's proposal. Pursuant to the schedule they proposed, the parties briefed their respective motions for judgment on the administrative record, and defendant supplemented its motion with a request that the court dismiss TMR's protest because TMR waived the right to challenge the GSA's solicitation. TMR also filed a motion to supplement the administrative record with a declaration addressing why TMR would be irreparably harmed without injunctive relief. The court held oral argument, as requested by the parties, on September 13, 2018. During oral argument, TMR represented that it was not challenging the terms of the solicitation. Based on that representation, defendant stated that denying its motion to dismiss as moot was appropriate. The parties' motions are now ripe for adjudication.

### II.  LEGAL STANDARD

In ruling on motions for judgment on the administrative record pursuant to RCFC 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, 404 F.3d at 1356.

When adjudicating a motion for judgment on the administrative record in a bid protest, the court reviews challenged agency actions pursuant to the standards set forth in the

---

[6] The agency exceeded its stated target of eighty awardees as a result of a four-way tie for the seventy-eighth position. AR 1776.

Administrative Procedure Act.  28 U.S.C. § 1491(b)(4) (2012).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  In a postaward bid protest, "a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote, 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there

was a reasonable likelihood that the protester would have been awarded the contract."). This test for establishing prejudice "is more lenient than showing actual causation, that is, showing that but for the errors [the protestor] would have won the contract." Bannum, 404 F.3d at 1358.

### III. ANALYSIS

In its motion for judgment on the administrative record, TMR argues that its protest should be sustained for three reasons: (1) the CO failed to adequately document his decision; (2) the CO erred in concluding that TMR did not justify its pricing, and (3) the CO's evaluation of TMR's pricing was flawed. Defendant responds that the CO adequately documented his decision and provided a reasoned analysis in accordance with the terms of the solicitation.

### A. Adequate Documentation

With respect to plaintiff's first contention, it is beyond dispute that the CO was required to document the reasoning for his decision. E.g., Lab. Corp. of Am. Holdings v. United States, 116 Fed. Cl. 643, 652 (2014) ("An agency must articulate a satisfactory explanation for an action to permit effective judicial review."); see also Federal Acquisition Regulation 15.308 ("The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments . . . ."). Relying on that principle, TMR argues that the CO erred by not documenting his analysis of TMR's justification in its BOE for proposing direct labor rates outside of the DOL ranges. But this argument misses the mark because the CO concluded that TMR did "not provide any justification" in its BOE for its direct labor rates falling outside of the DOL ranges.[7] AR 1540; see also id. ("[T]here is no mention of the labor rates falling outside the [DOL] ranges."). Otherwise stated, the CO did not document an analysis of TMR's justification because he concluded that TMR had not provided a justification.[8] Thus, the CO's documentation of his decision was adequate.

### B. TMR's Purported Justification

TMR next argues that the CO's conclusion that TMR did not justify its pricing is not supported by the record. TMR asserts that it adequately justified its pricing by explaining in its BOE how it derived its direct labor rates, which were premised on (1) rates approved for its prior government contracts and (2) information from [. . .] and [. . .]. Defendant counters that TMR's BOE merely contained the information required from every offeror: an explanation of the offeror's pricing methodology and labor and burden rates estimating practice. Defendant asserts

---

[7] To the extent that TMR is arguing that the CO was required to conduct and then document an analysis of whether TMR's direct labor rates were reasonable, it misconstrues the evaluation process set forth in the solicitation. Pursuant to that process, an offeror who proposed rates outside of the DOL ranges was required to provide a clear and convincing rationale for that deviation for those rates to be considered fair and reasonable. AR 153. In other words, a clear and convincing rationale is a condition precedent to a finding of fair and reasonable pricing.

[8] TMR's argument that the CO's conclusion is incorrect is a distinct issue, which is addressed in Section III.B.2, infra.

that supplying such information does not satisfy the independent requirement that offerors who are proposing rates outside of the DOL ranges supply a clear and convincing rationale for their rates.

The analysis of whether the CO reasonably concluded that TMR did not justify its direct labor rates deviating from the DOL ranges begins with TMR's BOE, which is where TMR argues that it justified the deviations.  In its BOE, TMR outlined its methodology for determining its rates:  a combination of rates used in prior contracts and information from [. . .] and [. . .].  TMR bolstered its methodology discussion by stating how the latter two sources derive their information and who uses that information.  But TMR did not acknowledge that its rates were outside of the DOL ranges.  Although the GSA did not require such a statement, it was reasonable for the CO to conclude that TMR's failure to acknowledge the deviations suggests that it was merely outlining its methodology—a requirement imposed on all offerors—rather than providing a justification for its rates being outside of the DOL ranges.  Moreover, TMR's argument that its explanation of its methodology for calculating rates also satisfied the requirement to justify its divergent rates is not persuasive because it rests on an unworkable interpretation of the solicitation.  If an offeror's description of its methodology was sufficient to justify its rates, there would be no need for the GSA to require offerors who propose rates outside of the DOL ranges to submit and clear and convincing rationale for their deviations.  That is to say, TMR's argument is untenable because it is based on an interpretation of the solicitation that renders superfluous the obligation to provide a justification for deviating from the DOL ranges.  See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("An interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous.").  In sum, the CO's conclusion that TMR did not justify its deviations from the DOL ranges is supported by the record.

### C.  Evaluation

In addition to disputing the CO's conclusion that it did not justify its pricing, TMR argues that the CO conducted a flawed evaluation of whether it proposed reasonable pricing.  First, TMR argues that the CO relied on TMR's rates being too high for some jobs and too low for others even though he was conducting a price reasonableness analysis, which is limited to determining whether the proposed rates are too high.  The GSA, however, explained in the solicitation that whether the pricing was too low or too high was an important consideration.  See AR 153 (explaining that a rate outside of the DOL range triggers the offeror's obligation to submit a justification for the rate); see also id. at 141 (instructing offerors that if their "proposed direct labor rate is either lower or higher than the provided range, [their] pricing may be deemed to be not fair and reasonable" (second emphasis added)).  Furthermore, TMR fails to demonstrate any prejudice from the purported error because the CO also acknowledged that TMR proposed a significant number of rates that were above the appropriate benchmarks.  See id. at 1539 (noting that [. . .] CLINs were above the DOL ranges); id. at 1541 (noting that [. . .] CLINs were more than two standard deviations above the average fully burdened rate submitted by all offerors); see also Banknote, 365 F.3d at 1350 (requiring a protestor show that it had a substantial chance of receiving an award absent the alleged error).

Second, TMR argues that the CO improperly focused on only one element of the ultimate price—the direct labor rates. But the CO did not limit himself to the direct labor rates; he started by reviewing TMR's direct labor rates and then proceeded to analyze whether the fully burdened rates were acceptable. See AR 1541-42; see also id. at 1542 ("The fully burdened maximum rates proposed were also reviewed and are not comparable to others proposed in response to the solicitation.").

Third, TMR argues that the CO erred by eliminating it from the competition due to its purportedly high rates because the proposed rates were maximums that could be discounted. However, the GSA informed offerors that they would be evaluated on their proposed rates, id. at 153, and TMR fails to identify a solicitation provision that would permit (let alone require) the CO to consider potential discounts when reviewing the proposed rates. Thus, the CO did not commit an error by considering TMR's proposed rates rather than speculating on potential discounts. See Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 374 (2009) ("[A] fundamental tenet of procurement law [is] that proposals must be evaluated in accordance with the terms of the solicitation.").

Fourth, TMR argues that the CO relied on an unstated criterion to evaluate its proposal; specifically, TMR asserts that the CO considered its pricing to determine whether TMR understood the work that would be performed under the contract even though the GSA did not inform offerors that their pricing would be used in that manner. As TMR correctly notes, the CO concluded that TMR did not understand the work because it did not attempt to follow the instructions when it proposed direct labor rates outside of the DOL ranges without offering the justification required by the solicitation. TMR's assertion of error, however, is unavailing because the CO made the disputed statement after deciding the dispositive issue: whether TMR's pricing was fair and reasonable. Moreover, TMR does not explain how (or whether) the CO used the disputed statement in evaluating the fairness and reasonableness of TMR's pricing. Simply stated, TMR fails to demonstrate that the CO used unstated evaluation criterion when he concluded that TMR's pricing was not fair and reasonable.

Also in support of its fourth argument, TMR contends that the CO evaluated TMR's proposal by relying on the solicitation's instructions to the offerors regarding the necessary contents of a proposal rather than relying purely on the solicitation's evaluation criteria. TMR does not specify which instructions to offerors were used to evaluate its proposal, but the court presumes that TMR's concern lies with the CO repeating that portion of the instructions in which offerors were (1) advised that proposed direct labor rates outside of the DOL ranges may not be considered reasonable and (2) cautioned that their failure to provide a rationale for such rates would lead to the rates not being considered reasonable. Although the CO quoted from the instructions in his price-analysis memorandum, the evaluation section included materially identical language. Compare AR 1540 (memorandum), with id. at 153 (solicitation's evaluation criteria). Under these circumstances, TMR's argument is not persuasive because it exalts form over substance. But even if the CO erred by referencing language from the instructions section, the error was not prejudicial given the similarity of that language to the language in the solicitation's evaluation section. See Banknote, 365 F.3d at 1350.

Fifth, TMR argues that the CO erred by relying on the average pricing proposed by awardees to evaluate whether its pricing was too high.  Specifically, TMR contends that the average was skewed because the awardees probably just used direct labor rates within the DOL ranges suggested by the GSA.  As an initial matter, the court notes that the CO apparently relied on the average rates proposed by all offerors—not just awardees.  See AR 1541-42 (relying a on a chart containing the average rates to evaluate TMR's proposal, which would not have been possible if the rates reflected only the awardees); see also supra note 5.  The analysis of TMR's argument, however, would not change if the CO relied on just the awardees' rates.  Ultimately, the argument is unavailing because it is speculative; TMR does not purport to know how the other offerors decided their rates or whether their decisions actually skewed the average towards the GSA's recommended ranges.  Furthermore, even if TMR were correct that most offerors chose to stay within the limits suggested by the GSA, TMR does not demonstrate that the CO's reliance on an average derived from the proposals the GSA received was unreasonable.  Simply stated, TMR merely disagrees with the CO's chosen metric and such disagreement is insufficient to show that the CO's decision was unreasonable.

Even if any of the above arguments supported the conclusion that the CO erred when evaluating TMR's proposal, TMR still would not prevail because it cannot show prejudice.  The purported errors in the CO's evaluation of TMR's proposal would not have affected his conclusion that TMR failed to provide a justification for its pricing that deviated from the DOL ranges, and the absence of a rationale meant that TMR's proposal was "deemed to have a maximum rate[] that is not considered fair and reasonable and [that] the proposal [was] not . . . eligible for award."  AR 153.  Otherwise stated, TMR did not have a substantial chance of receiving an award without the CO's purported errors.  See Banknote, 365 F.3d at 1350.

### D.  Summary

In sum, TMR fails to demonstrate that the CO erred or that its protest should otherwise be sustained.  Because TMR does not succeed on the merits of its protest, TMR is entitled to neither costs nor injunctive relief.  See ARxIUM, Inc. v. United States, 136 Fed. Cl. 188, 198 (2018) ("A lack of success on the merits . . . obviously precludes the possibility of an injunction."); Q Integrated Cos. v. United States, 132 Fed. Cl. 638, 642-43 (2017) ("A protestor thus must prevail on the merits at least in part before the court can grant an award of bid preparation and proposal costs.").  Consequently, the court need not consider the affidavit submitted with TMR's motion to supplement the administrative record.

### IV.  CONCLUSION

For the reasons discussed above, the court **GRANTS** defendant's cross-motion for judgment on the administrative record, **DENIES** TMR's motion for judgment on the administrative record, and **DENIES** as moot defendant's motion to dismiss and TMR's motion to supplement the administrative record.  TMR's protest is **DISMISSED.**  No costs.  The clerk is directed to enter judgment accordingly.

The court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. Then, by **no later than Thursday, September 27, 2018,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge